## REUBEN M. RODDIE v. STATE.

No. A-3576. Opinion Filed May 23, 1921.

(198 Pac. 342.)

(Syllabus.)

1.  **Evidence—Res Gestae—Declaration of Accused.** If a declaration which serves to explain an act, is made by the defendant while doing the act, such declaration is admissible in evidence when the motive, object, or purpose of the act is the subject of the inquiry.

2.  **Same.** Declarations, as a part of the res gestae, are regarded as verbal acts or verbal parts of an act, indicating a present purpose or intention, and, therefore, are admitted in proof like any other material facts.

3.  **Same.** If a declaration explains a relevant fact, it is not incompetent merely because its utterance precludes the actual commission of a crime. Evidence is always relevant which shows that the defendant made preparations to commit a crime, and from such preparative actions a criminal intention may be inferred. Declarations accompanying these acts of preparation are received to explain their significance, and indirectly to illuminate the subsequent conduct, and state of mind of the defendant.

4.  **Homicide—Evidence—Res Gestae—Declarations of Accused.** On a trial for murder it became important to ascertain in what state of mind defendant was at the time he discharged his pistol; whether the act was done with deliberation, or under such sudden excitement of fear, or surprise, or provocation as would reduce the homicide from murder to manslaughter, or as would justify the use of a deadly weapon in resisting an assault. The evidence shows that defendant had an affray with the father of the deceased at the court house; that he then went to his office and was informed that deceased and his father were on the streets looking for him for the purpose of doing him great bodily harm; that defendant then took a pistol from his desk and put it in his pocket, and went down on the street, and went into the second store from the stairway to his office; he came out and passed a drug store adjoining said stairway, stopped and talked with a group of men, then turned and went to the drug store in front of which the shooting occurred. Each witness who testified to these acts of the defendant was asked what statement, if any, defendant made.

    On the state's objection the statements by witnesses as to what defendant said were excluded. Held, that the defendant's statements and declarations were admissible as a part of the res gestae, and their exclusion was prejudicial error.

5.    Homicide—Self Defense—Fear of "Great Personal Injury." The phrase "great personal injury", as used in the statutes (section 2334, Rev. Laws) means something more than apprehension, however imminent of a mere battery; it means a serious and severe bodily injury of a greater degree, not necessarily amounting to a felony. In order to justify the assault and to slay an assailant, within the meaning of this section, there must be an apparent design on the part of the assailant to either take the life of the person assailed or the infliction of some great bodily injury, not necessarily amounting to a felony, if carried out, and in addition thereto, there must be reasonable ground for believing that there is imminent danger of such design being accomplished.

6.    Trial—Instructions—Uncertainty. An instruction is erroneous, although correct as an abstract proposition of law, if it leaves the jury in doubt or uncertainty as to how it should be applied to the evidence.

7.    New Trial—Grounds—Disqualification of Juror. Where a defendant accepts a juror without availing himself of the right to challenge him for cause, he will not, after conviction, be allowed to make the objection that the juror had formed and expressed an opinion adverse to him, as a ground for a new trial.

8.    Appeal and Error—Review—Presumption of Prejudice—Misconduct of Jury. The jury being composed of twelve individuals, the misconduct of any juror which might have been prejudicial to the defendant is misconduct of the jury, because the jury can only act as a unit, and where, in a capital case, such misconduct exposes the jury to improper influences, prejudice to the defendant will be presumed, and the burden of proof is on the state to show that as a matter of fact the defendant suffered no injury by reason of such misconduct.

9.    Judges—Disabilities—Acting as Attorney. Under the statutes of this state an attorney at law, who holds a commission as judge of any court of record in this state, is prohibited from practicing law as an attorney, counselor, or advocate in any of the state courts so long as he occupies such official position.

10.    Trial—Disqualified Judge Aiding Prosecution—Reversal. When a judge of a court of record disqualifies in a criminal case and on the part of the prosecution participates in the trial, a judgment of conviction will be reversed, on the ground that the defendant did not have a fair and impartial trial.

Appeal from District Court, Pontotoc County; C. E. Dudley, Assigned Judge.

Reuben M. Roddie was convicted of manslaughter in the first degree, and he appeals. Reversed.

Robert Wimbish, King & Crawford, W. F. Schulte, B. C. King, J. B. Dudley, Ben F. Williams, and John E. Luttrell, for plaintiff in error.

S. P. Freeling, Atty. Gen., W. C. Hall, Asst. Atty. Gen., Wayne Wadlington, Co. Atty., W. W. Pryor, and J. F. McKeel, for the State.

DOYLE, P. J. This appeal is from a judgment of conviction in the district court of Pontotoc county, rendered January 20, 1919, in pursuance of a verdict finding the defendant guilty of manslaughter in the first degree and assessing his punishment at confinement in the penitentiary for ten years.

The information in substance charged that the defendant, Reuben M. Roddie, did in said county on the 3rd day of October, 1917, commit the crime of murder by shooting one Percy Barton with an automatic pistol.

Reuben M. Roddie, the defendant, is a lawyer, an ex-State Senator, and has been prominent in political affairs in the state. The deceased, Percy Barton, was a soldier, home on a furlough, about twenty-two years of age. He was the son of C. O. Barton, a lawyer and a former judge of the county court of Pontotoc county.

The evidence shows that on the 3rd day of October, 1918, the defendant and Judge Barton were opposing counsel in a matter being heard before the district court of Pontotoc county. In the course of the hearing, just before the noon hour, an altercation occurred between the defendant and Judge Barton, and they engaged in a fist fight in the court room, which was soon stopped and the parties separated by bystanders. The court properly excluded the details of the

difficulty between the defendant and Judge Barton. Immediately after the affray Judge Barton called the defendant a vile name and said, ''You will answer for this,'' and left the court room. The defendant then went to his office. A few minutes later, Judge Barton returned to the court house, accompanied by his son, Percy, the deceased.

The father directed his son to go into the court room, but if court was in session not to jump on him in there. They looked in the court room; not seeing the defendant, they left the court house and the father was heard to say to his son, ''The damn cowardly son-of-a-bitch has gone, but if you don't hunt him up and whip him for beating up your daddy, you are no son of mine, and I will disown you.'' On leaving the court house the Bartons went to Main street and Percy Barton passed along Main street in front of the stairway leading to the defendant's law office. Meeting Dr. Ross, he asked him to go and attend to his father's injuries. Dr. Ross went to Judge Barton's office for that purpose and Percy Barton entered the Smith Drug Store.

The court house in the city of Ada is on Twelfth street and fronts north. Twelfth street is parallel to and a block south of Main street. On the south side of Main street, fronting north, is the Smith Drug Store. Next east is the Rollow Hardware Store, and next east of the Hardware Store is the Model Clothing Store. The street running north and south, east of the block containing these stores, is Broadway; the front stairway leading to the defendant's law office is between the Smith Drug Store and the Rollow Hardware Store; there is also a back stairway to this building, the same being opposite the front of the court house. Shortly after arriving at his office the defendant was called over the telephone by Walter Goyne, a constable and special deputy sheriff, and told that the Bartons, father and son, were at the court

house looking for him, and that he had better go home and stay out of the way or there would be trouble.

The defendant sent his stenographer, Miss Tampa Cole, down on Main street to see if the Bartons were anywhere in sight. Miss Cole went down on Main street and not seeing the Bartons came back and so reported. There was an abrasion on the neck of the defendant as the result of his fight, and the blood from this had soiled his collar and tie, which he took off. After Miss Cole reported to him he went down the front stair-way to Main street and went one door west to the Model Clothing Store and purchased a collar and tie. While in the store, Walter Goyne came in and again told him that the Bartons were walking the streets looking for him, that he had better go home to avoid serious trouble. He replied that he didn't like to run away, but would go home. The defendant on leaving the clothing store passed the Smith Drug Store, stopped and spoke to Walter Goyne, who was in company with John Ralls, chief of police of Ada, Theodore Rogers and Henry Stuckey. He then noticed or his attention was called to the fact that his neck was still bleeding and he remarked that he would go in the drug store and get something to put on it. He started towards the drug store and as he approached the entrance the deceased came out. The testimony is conflicting as to the acts of the deceased just before and at the time of the shooting. The testimony for the state tends to show that the deceased advanced upon and made an assault upon the defendant with his fist and that the defendant drew a 32 automatic pistol and fired; that there was a short interval and then there were two or three more shots in quick succession. The deceased fell to the sidewalk almost in front of the Rollow Hardware Store. Walter Goyne stepped up, took the defendant's pistol from him and took him to jail.

The shooting occurred between twelve and one o'clock; the deceased died about 9:30 that evening. There was a bullet hole through his right arm, one through his left arm; one through his right thigh, and one through his left thigh. One or two witnesses testified that four shots were fired. A statement of the deceased made shortly before his death was admitted as a dying declaration. He was asked by a doctor, "How did this happen?" and said, "I waited there until he came up. As I reached to get him he was too quick for me and got his gun and shot me. He got me, but if he hadn't gotten me, I would have gotten him. He beat up my dad. It was up to me to take him up. I was going to whip him man to man."

As a witness in his own behalf the defendant testified that after the difficulty in the court room he went to his office, and shortly after Walter Goyne called him by telephone and told him that Judge Barton and Percy Barton had been to the court house hunting for him; that he had better go home or get out of the way to avoid trouble; that hearing this he was alarmed and took his pistol from the drawer of his desk and went down on the street and into the Model Clothing Store and bought a collar and tie. While in the store Walter Goyne came in and told him that the Bartons were walking the streets hunting for him, that he had better get off the streets or he might get killed. Leaving the store he went up the street to where Walter Goyne, John Ralls, Henry Stuckey and Theodore Rogers were standing; that he did not look in the Smith Drug Store in passing on the way to where these men were standing, and did not see the deceased in the store. After standing a minute or so on the street he started into Smith's Drug Store, because his neck had begun to bleed and he wanted to get something to stop it. As he reached the vestibule of the drug store he saw the deceased, who rushed upon and attacked him, and as he expected to be killed either by Percy Barton, or his father, he

jumped back and reached for his gun, and threw his left arm up to protect his face, and drew his gun from his right hand pocket and fired; that deceased kept coming on and caught hold of the pistol.

Then he fired twice rapidly and turned around expecting to see Judge Barton, and saw John Ralls walking towards him with a gun; that Walter Goyne came up to him and he handed him the pistol.

Nothing in the foregoing statement is to be taken as expressing the views of this court upon the weight of the evidence. That consideration is not before us. The statement is made for a better understanding of the propositions of law which we are called upon to consider.

Numerous errors have been assigned and the questions thereby presented have been ably and elaborately discussed by counsel on both sides, both orally and in the briefs. The view we are constrained by our sense of judicial duty to take of this case will render it unnecessary to pass upon all the questions discussed by counsel, but some of these questions we will consider and decide.

One of the grounds relied upon for a reversal of the judgment is that the court erred in refusing to admit competent, material and relevant evidence offered by the defendant. When the defendant's witness, Walter Goyne, was upon the stand he was questioned as to what the defendant said to him and others on the street just before he left them to go into Smith's Drug Store. The court sustained the state's objection to this offered testimony, as appears from the following statement in the record:

"Q. Do you know for what purpose Mr. Roddie went into the drug store?

"A. Well, I do not know, only what he said.

"Q. Well, I will ask you to state if his neck was bleeding at the time?

"A. Yes, sir.

"Q. What, if anything was said about going to get some medicine for it?

The state objects as incompetent, irrelevant and immaterial. Objection sustained. Exception reserved.

Counsel for the defendant (out of hearing of the jury):

"We expect the answer to be that he said he would go in the drug store to get some medicine for his neck.

"Q. When Roddie left where did he start to go?

"A. He started to go into the drug store.

"Q. For what purpose, if you know?

"The State: Same objection.

"The Court: The witness has answered that he only knew what Mr. Roddie said. Objection will be sustained. He may answer if he knows.

"A. Nothing only what he said is all.

"The Court: Objection sustained. Exceptions reserved.

"Counsel for the defendant: We expect the witness to state that he went there to get something for his neck."

The same offer of evidence was made when the defendant's witness Henry Stuckey was on the stand, as appears by the following statement in the record:

"Q. After John Ralls left what if anything did Roddie do or say?

"A. Roddie felt of his neck and asked—"

The state objects as incompetent, irrelevant and immaterial.

"The Court: Objection will be sustained as to what he said. Exception reserved.

"Counsel for the defendant: The answer will be that he made the remark that he would go into the drug store and get some medicine for his neck."

Miss Tampa Cole testified that she had been in defendant's employ as a stenographer for some years; that the defendant came to his office about 12:30, his neck was bleeding and his collar and tie were bloody; in a few minutes Walter Goyne called over the telephone and asked for the defendant and he talked with him over the telephone, then the defendant went to a desk drawer and took out a revolver and put it in his pocket.

She was then asked:

"Q. You may state to the jury whether or not at that time he sent you anywhere for any purpose?"

State objects, incompetent, irrelevant and immaterial.

The jury was excused in charge of the bailiff. Thereupon the defendant's counsel stated:

"We expect her answer to be that he sent her out with instructions to go down on the street and see if these parties were not on Main street; that if they were not he was going to go to dinner; that she went down on the street and walked up and down Main street and returned and reported to him that she did not see either one of them."

In the absence of the jury this witness testified:

"Mr. Roddie told me to go down the street and see if I could see Percy Barton or his father, and if they were on the street he would stay in his office; I went down the street and as I passed Broadway I looked both west, north and south and didn't see anything of them. I came back to the office and told him that I did not see them or either of them.

"By the Court: Any statement that he made to her about going down on the street to ascertain where the Bartons were would be self-serving; anything that he said to her about going down on the street, what she said to him when she came back is not competent."

Exception reserved.

It is earnestly contended on the part of the defendant that all this evidence was admissible as a part of the res gestae, and that the exclusion of this offered evidence was prejudicial to the substantial rights of the defendant.

In view of the varying theories based upon the facts attending this homicide it became important to ascertain, and it was a material fact for the jury to determine, what was the defendant's purpose in arming himself, and in going to the drug store. Acts which a defendant may do and justify himself under a plea of self-defense depend primarily upon his own conduct, and secondarily upon the conduct of the deceased. However, there is no fixed rule applicable to every case. If a man, while in the lawful pursuit of his business, without fault on his part, is placed under circumstances sufficient to excite the fears of a reasonable person, that another designs to commit a felony, or some great bodily injury upon him, and to afford grounds for reasonable belief that there is imminent danger of an accomplishment of this design, he may, acting under these fears alone, slay his assailant and be justified by the appearances, and as where the attack is sudden and the danger imminent, he may increase his peril by retreating, so situated he may stand his ground and slay his assailant.

On the other hand, if one who has taken the life of an assailant was himself in the wrong, he cannot plead self-defense, but the wrong which will preclude him from making that defense must relate to the assault in resistance of which the assailant was killed.

If after the affray in the court house the defendant armed himself with a deadly weapon and sought the deceased with a view of provoking a difficulty, or with the intent of having an affray, and the deceased assaulted him and he killed his assailant, his plea of self-defense would be of no avail, for the law will not hold him guiltless who, by

seeking a combat and continuing therein, brings upon himself the necessity of killing his fellowman.

We are clearly of the opinion that the defendant's declarations should have been admitted as a part of the res gestae.

Declarations as a part of the res gestae are regarded as "verbal acts or verbal parts of an act, indicating a present purpose or intention, and therefore, are admitted in proof like any other material facts." 3 Wigmore Ev. sec. 172; 1 Greenl. Ev. sec. 108; 10 R. C. L. 76.

Underhill says:

"The rule of the res gestae is based upon the principle that when one part of a transaction is shown by one party, the other may bring out all or any part of the remainder. Hence, the whole declaration or conversation must be stated and admitted. * * *

"If the declaration meets the requirements of the rule now under consideration, that is, of it explains or illustrates a relevant fact, it is not incompetent merely because its utterance precedes the actual commission of the crime. Evidence is always relevant which shows that the accused made preparations to commit a crime, and from such preparative actions a criminal intention may, with justice, be inferred.

"Declarations accompanying these acts of preparation are received to explain and unfold their significance, and, indirectly to illuminate the subsequent language, conduct, and state of mind of the accused." Underhill, Cr. Ev. secs. 99 and 100.

If the declaration is made while doing an act, the nature, object or motive of which is a subject of inquiry, and serves to explain it, then such declaration is admissible in evidence. And it is generally in this class of cases where either the nature, object or motive of the act is material, that this rule receives its broadest application.

In Sunday v. State, 14 Okla. Cr. 620, 174 Pac. 1095, it was held:

"On a trial for murder, where it appeared that the deceas-ed and the defendant had an altercation during the progress. of a card game, and the defendant then went to his home and procured a gun, and returned therewith, and shot the deceas-ed, statements made by the defendant to his sisters that he was taking the gun with the intention of arresting the de-ceased, were admissible as part of the res gestae."

In the opinion it is said:

"Self-serving declarations are not admissible for the de-fense, unless they form a part of the res gestae. Declarations. as a part of the res gestae are regarded as verbal acts indicat-ing a present purpose and intention, and therefore are admit-ted in proof like any other material facts."

It is urged that the offered testimony was of the utmost importance to the defendant; that on the theory of the state, it. was argued to the jury by counsel for the state that the de-fendant armed himself and was either seeking the deceased. and his father, or was going where he might expect to meet them with the intention of having an affray, and that the ac-tion of the defendant in sending Miss Cole to see if she could see anything of the Bartons, if unexplained by his statement of purpose in so doing, might be argued and was argued to. be for the purpose of locating them so that he might hunt them up for the purpose of engaging in a difficulty; and that the offered testimony was material as tending to show the state of mind of the defendant, and went to form a part of the res gestae.

The court held that the acts of the defendant at the time in question were admissible, and allowed the witnesses Goyne,. Stuckey and Miss Cole to testify what the defendant did in their presence, but excluded the declarations of the defendant which accompanied and tended to explain his actions. Under the rule above stated, if the acts themselves were admissible, the defendant's declarations which accompanied them were.

:also admissible.  What bearing it might have had in the minds
of the jury, had this evidence been admitted, is not a ques-
tion for our consideration.  The defendant in a criminal pros-
·ecution for any offense is entitled to a fair and impartial trial,
·conducted in accordance with the rules of law; the question
of his guilt or innocence should be determined upon legal evi-
·dence, and where competent and material evidence has been
offered on the part of the defendant and erroneously rejected
by the court, we are not at liberty to say that the error is
merely technical, or that the substantial rights of the defend-
.ant have not been prejudiced.  Here the defendant was on
trial for his life, and he was entitled to the benefit of what-
·ever competent evidence he could produce.

It is also contended that the defendant did not have a
fair and impartial trial, in that Lee Nettles, one of the trial
jurors, and formed and expressed an opinion adverse to the
·defendant previously to his being sworn as a juror.  This was
·one of the grounds of the motion for new trial, and was sup-
ported by affidavits.  According to the affidavit of L. J. Crow-
·der, the juror Nettles came into affiant's place of business
.and made the following statement, "I see that Roddie is back;
he is guilty and should be punished; he ought to have from ten
to twenty years in the penitentiary."  According to the affi-
·davit of B. F. McCauley, the juror Nettles came into affiant's
.place of business, and while he was  there the defendant came in
and after transacting business, left and immediately there-
.after the juror  Nettles remarked to affiant, "Roddie's trial is
coming up pretty soon, isn't it? The affiant replied that he did
not know.  Said juror further stated, "Roddie is guilty and
.should be punished.  He ought to be sent to the penitentiary
from ten to twenty years."  Also affidavits that neither the
defendant nor his counsel knew at the time of the impaneling
·of the jury that the alleged statements had been made.

The state offered nothing in rebuttal of these affidavits, but stood on the statements of the juror made on his voir dire. The record does not contain the examination of the jury upon their voir dire, but it is conceded that the juror Nettles was not examined by counsel for the defendant. In Horton v State, 10 Okla. Cr. 294, 136 Pac. 177, this court said:

"We think it may be safely said that upon principle, if the defendant accepts a juror without availing himself of the right to examine such juror on voir dire, for the purpose of testing his impartiality, or without availing himself of the right to challenge him for cause, and it should be discovered after the verdict that he was incompetent by reason of prejudice, the defendant would not be entitled to a new trial on that ground under our statute."

It was further shown by affidavits in support of the motion for new trial that the juror Nettles was guilty of misconduct in separating from the other jurors, without leave of court, and in holding a private conversation with his wife. The testimony taken on the hearing of the motion shows that the juror Nettles and his wife had their living rooms in the same building across the hall from the office of Judge Barton, the father of the deceased; that his wife attended the trial of the case and sat in the courtroom with the wife and mother of the deceased, and that evening the juror went to his living rooms and talked with his wife; that he first told the bailiff that he wanted to get his overcoat; one of the bailiffs went and got the coat for him; he then insisted that he should go to his rooms to get some face cream; the bailiffs took the juror upstairs and allowed him to enter his room; one of the bailiffs followed, and found him talking to his wife and making no effort to get what he said he wanted; that the bailiff was compelled to forcibly take him from the room and place him with the other jurors.

The state offered nothing in rebuttal, and the evidence in support of this ground for a new trial was uncontroverted.

The defendant in any criminal case is entitled as a matter of right to require in the first instance a compliance with the provisions of law safeguarding his right to a fair and impartial trial; and, if the provisions of law intended for his security are willfully disregarded, he may require the state to show that he has not been prejudiced by reason of such noncompliance.

Under the provisions of our Criminal Code, jurors sworn to try a felony case may be kept together in charge of proper officers, or may in the discretion of the court, at any time before the submission of the case to them, be permitted to separate. Section 5899, Rev. Laws.

In Armstrong v. State, 2 Okla. Cr. 567, 103 Pac. 658, 24 L. R. A. (N. S.) 776, there was no proof of misconduct while the jury was separated. This court said:

"The legal presumption is that jurors perform their duty in accordance with the oath they have taken, and that presumption is not overcome by proof of the mere fact that, during the adjournment of a trial, the jurors were permitted to separate. The defendant must affirmatively show that by reason thereof he was denied a fair and impartial trial, or that his substantial rights were prejudiced thereby."

In Weatherholt v. State, 9 Okla. Cr. 161, 131 Pac. 185, it is said:

"The fact that a juror in a capital case became separated from his fellow jurors at a recess during the trial, and left the custody of the officers who had the jury in charge, is not sufficient ground to grant a new trial, where it does not appear that he had any communication with any one concerning the cause, either directly by conversation, or indirectly, by overhearing the observations of others, or that he did any act inconsistent with his duty as a juror during such separation."

Among the personal safeguards contained in section 20, art. 2, Const., is the right of the accused in a criminal prosecution to have "a speedy and public trial by an impartial jury." A jury being composed of 12 individuals, the misconduct of any juror is misconduct of the jury, because the jury act as a unit, and misconduct by one or more of the jury which might have been prejudicial to the defendant raises the presumption in a capital case that the defendant has been prejudiced thereby, and the burden of proof would be on the state to show that as a matter of fact the defendant suffered no injury by reason of such misconduct.

It follows that in a trial for murder, if a juror willfully and without necessity withdraws from his fellows and goes to a place where communication may be secretly had with another, his willful conduct, unexplained, may be sufficient to impair the faith which would otherwise be reposed in the integrity of his verdict, and in this case, under the circumstances shown, which exposed the jury to improper influences, the burden of proving there was no prejudice to the defendant resulting from the misconduct complained of was upon the state.

Another ground of the motion for a new trial was that the defendant did not have a fair and impartial trial for the reason that J. W. Bolen, the regular judge of the district court, participated in the prosecution after having certified his disqualification to try the case. On the hearing, Judge Bolen testified in part as follows:

"Q. During the progress of the trial, Judge, did you take any active part in it? A. I was not very active; no, I did a few things, not very many.

"Q. Now, when the panel was drawn for the trial of this case, they were summoned to be here on Monday morning? A. Yes, sir.

"Q. At which time you opened court and discharged the jury? A. Until Tuesday.

"Q. When you discharged the jury, I will ask you if you didn't make this statement, 'that none of the jurors need come to you to offer any excuse, because you would not discharge them, as you and the defendant were not sweethearts?' A. I said in substance that the defendant and myself were not sweethearts, and if I discharged any of the jurors there would be criticism.

"Q. Did you participate in the trial to the extent of assisting in the selection of the jury? A. I made some suggestions; yes.

"Q. Did you write a note giving the name of Lee Nettles and Jim Whitaker, and say that they were men friendly to John Ralls, and they would never believe that John Ralls fired the shot? A. After Nettles was accepted and the jury sworn the defense seemed to start out upon the theory that John Ralls fired the shot that might have killed the Barton boy, and I knew that Lee Nettles or Jim Whitaker either wouldn't like the idea of accusing John Ralls of murder. I simply made that suggestion to some lawyer in the case, I don't know who; I made the suggestion, however.

"Q. Did you write that (producing a note which read as follows):

"Lee Nettles & Jim Whitaker are good friends to Jno. Ralls will never believe he fired a shot."

"A. Yes, sir."

Under the statutes of this state an attorney at law who holds a commission as a judge of any court of record of this state is prohibited from practicing law as an attorney, counselor, or advocate in any of the state courts so long as he occupies such official position. Section 240, Rev. Laws 1910.

The law aims, as far as possible, to give the accused a trial that shall not only be fair, but as free as may be from any suspicion of partiality or undue influence. The impro-

priety of a judge leaving the bench and appearing as counsel in a criminal case on trial in his own court is perfectly apparent, and could not be otherwise than prejudicial to the substantial rights of the defendant.

In the case of Lilly v. State, 7 Okla. Cr. 284, 123 Pac. 575, Ann. Cas. 1914B, 443, this court held that:

"When a judge of a court of record vacates the bench and prosecutes a person charged with crime in the court over which he presides and before a jury drawn and impaneled by him, a judgment of conviction had under such circumstances will be reversed."

In this case we are of the opinion that the testimony of the judge of the district court of Pontotoc county shows that he participated in the trial to such an extent as to prejudice the rights of the defendant.

Several errors assigned are based on the refusal to give instructions requested and on exceptions taken to certain instructions given. The instructions given by the court embraced the law of all proper requests made by the defendant, and it seems to us that the charge of the court fully covered every phase of the case to which testimony is applicable. It would be unprofitable to extend this opinion with a reproduction of all the instructions excepted to. We will, however, notice some of the objections urged against the instructions that were given.

The fifteenth instruction reads:

"By serious bodily injury is meant to maim or to inflict an injury which may be permanent in its character, or which may result in death."

To this instruction the objection stated is:

"The decisions, in defining the nature of the injury or harm to prevent which one may resist to the point of taking

life, includes a wider scope of possible injury and injuries of a less serious character than those classified in the instruction given in this case.''

—citing Boykin v. People, 22 Colo. 503, 45 Pac. 422, holding that the words "great bodily harm" in the law of self-defense "mean something more than a mere slight injury like a simple assault and battery, from which only a slight injury would likely to be suffered. It means a serious and severe injury of a greater degree," and Rogers v. State, 60 Ark. 76, 29 S. W. 894, 31 L. R. A. 465, 46 Am. St. Rep. 154, holding that "great bodily injury does not necessarily amount to a felony committed on the person." The court said:

"The phrase 'great bodily injury' is difficult to define, for the reason that it well defines itself. It means a 'great bodily injury,' as distinguished from one that is slight or moderate, such as would ordinarily be inflicted by an assault and battery with the hand or fist without a weapon. To put one in danger of great bodily injury from an assault, something more than attack with the hand or fist would usually be required, and it would rarely happen that one might lawfully take the life of another to avoid an assault with the fist only. But cases might be supposed when it would be justifiable to do so; for an assault and battery by a powerful man with his fist upon a weak one might be carried to such extreme severity as to produce great bodily injury, and yet be unaccompanied by such circumstances as to make it a felony. One who intentionally commits a great bodily injury upon the person of another may or may not be guilty of a felony, depending upon the circumstances; but, as such an injury may, under some circumstances, be committed, and still the offender not

be guilty of a felony, it is therefore not accurate to define 'great bodily injury, as a felony committed on the person'. What constitutes a great bodily injury, and whether the circumstances in any case are such as to justify one in believing that such an injury is about to be committed upon him, and in defending himself against it, are matters which must be left, to a great extent, to the judgment of the jury.''

In High v. State, 26 Tex. App. 545, 10 S. W. 238, 8 Am. St. Rep. 488, cited in the defendant's brief the court said:

"If the assault and battery in such a case is so slight as to show no intention to inflict pain or injury, then to kill the assailant would be murder; if pain, bloodshed, or great bodily injury be inflicted, then to kill the assailant will be either manslaughter or justifiable self-defense. Mr. Wharton says: 'If such intended beating is of a character to imperil life, or to maim, then the intent is felonious, and the assailed is excused in taking life when necessary to repel the assault. On the other hand, the killing of the assailant under such circumstances, the design of the assailant being to beat, is not murder, and at the highest is manslaughter.' Whart. on Hom. (2d Ed.) §480. It will be noticed that he limits self-defense which would excuse 'to imperil life or to maim,' and not to an attack which might produce serious bodily injury with or without imperiling life.

"We are of opinion the correct doctrine is more fully and lucidly expressed by the Supreme Court of Pennsylvania in the case of Commonwealth v. Drum, 58 Pennsylvania State, 1, than in any authority to which we have access, and it occurs to us that the following excerpts are peculiarly in harmony with our statutes upon the subject. Justice Agnew says: 'The act of the slayer must be such as is necessary to protect the person from death or great bodily harm, and must not be entirely disproportioned to the assault made upon him. If the slayer use a deadly weapon, and under such circumstances as the slayer must be aware that death will be likely to ensue, the necessity must be great and must arise from imminent peril of life or great bodily injury. If there be nothing in the circumstances indicating to the slayer at the time of his act

that his assailant is about to take his life or do him great bodily harm, but his object appears to be only to commit an ordinary assault and battery, it will not excuse a man of equal or nearly equal strength in taking his assailant's life with a deadly weapon. In such a case it requires a great display of size and strength on the part of the slayer, and a very violent assault on the part of his assailant, to excuse it. The disparity, on the one hand, and the violence, on the other, must be such as to convince the jury that great bodily harm, if not death, might have been suffered unless the slayer had thus defended himself, or that the slayer had reasonable ground to think it would be. * * * The true criterion of self-defense in such a case is whether there existed such a necessity for killing the adversary as required the slayer to do it in defense of his life, or in the preservation of his person from great bodily harm. If a man approaches another with an evident intention of fighting him with his fists only, and where under the circumstances nothing would be likely to eventuate from the attack but an ordinary beating, the law cannot recognize the necessity of taking life with a deadly weapon. In such a case (pain or bloodshed supervening) it would be manslaughter. * * * But a blow or blows are just cause of provocation, and, if the circumstances indicated to the slayer a plain necessity of protecting himself from great bodily injury, he is excusable if he slays his assailant in an honest purpose of saving himself from this great harm.' See Kingen v. State, 45 Ind. 519, also reported in Horrigan & Thomp. Self-Defense, 183. And in such a case, as in all cases of resistance to violence to the person, the assailed party is not bound to retreat, and the reasonable expectations and appearances of serious bodily injury must be judged of from his standpoint."

Our Penal Code provides that homicide is justifiable when committed by any person, when resisting any attempt to murder such person, or to commit any felony upon him, or when committed in the lawful defense of such person, when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished. Section 2334, Rev. Laws.

The phrase "great personal injury," as used in the statute, means something more than apprehension, however imminent, of a mere battery; it means a serious and severe bodily injury of a greater degree, not necessarily amounting to a felony. In order to justify the assault and to slay an assailant, within the meaning of this section, there must be an apparent design on the part of such assailant to either take the life of the person assailed or the infliction of some great personal injury, not necessarily amounting to a felony, if carried out, and in addition thereto there must be reasonable ground for believing that there is imminent danger of such design being accomplished. The use of a deadly weapon is justifiable for the purpose only of preventing an unlawful and violent attack on one's person, of such a nature as to produce a reasonable expectation or fear of death or great bodily injury about to be inflicted. There may be circumstances under which one violently attacked by another who is unarmed will be justified in using a deadly weapon in his defense, such as great disparity in years or one greatly his superior physically. Ordinarily the mere fact that one is approached in a threatening manner by another who is unarmed, and who is not his superior physically, will not justify him in using such a weapon. However, it is for the jury to say whether a person assaulted with hands or fists could, under the circumstances of the case, justifiably resist the assault with a deadly weapon.

The word "maim" in its ordinary sense means "serious physical injury," and its use in that sense in defining the phrase "serious bodily injury" would not mean the infliction of some great personal injury amounting to a felony. However, in view of the statutory definition of the offense of "maiming" (section 2345, Rev. Laws), we are inclined to think that the use of the word "maim" in this instruction might have left the jury in doubt or uncertainty as to how it should be applied to the evidence in the case, and for this rea-

son the fifteenth instruction should not have been given. We think the better practice is for the courts not to attempt to define the words ''great personal injury'' as used in the statute, or the phrase ''serious bodily injury'' or ''great bodily injury.'' These words and phrases define themselves and are used in their ordinary sense in common acceptance among the people, and need no explanation from the court in its charge to the jury.

It is also urged that the court erred in refusing to instruct the jury on the theory that the father of the deceased and the deceased were acting together in making the assault upon the defendant at the time the shooting occured.

In lieu of the instruction requested the court gave the following:

''No. 18. Evidence has been offered before you for the purpose of showing that a short time prior to the difficulty the deceased and his father were at the courthouse and on the streets looking for defendant for the purpose of engaging in a difficulty. If you find from the evidence in this case that deceased and his father were at the courthouse and on the streets looking for the defendant for the purpose of engaging in a difficulty, you may consider this fact for the purpose of ascertaining whether or not the deceased was the aggressor in the difficulty in which he lost his life, and if you find that it was communicated to the defendant that deceased and his father were out looking for him for the purpose of engaging in a difficulty and doing him great bodily harm, you may also consider this in connection with all the other testimony in the case, for the purpose of ascertaining whether or not the defendant believed that he about to lose his life or suffer great bodily harm at the hands of the deceased, and that he acted under the influence of such fear at the time.''

On this phase of the case we think this instruction was as favorable to the defendant as he had a right to demand, be-

cause there was no testimony offered tending to show that the father of the deceased was present at the time the shooting occurred.

As to other criticisms made, we deem it sufficient to say that the instructions, taken as a whole, were very fair to the defendant. We have, however, pointed out one error, and, as the cause must be retried, we will add that the court should, for the reason stated, omit the fifteenth instruction.

The questions already discussed are sufficient to dispose of the appeal. From a careful examination of the whole case, and for the reasons hereinbefore stated, we are clearly of the opinion that the defendant did not have that fair and impartial trial to which he was entitled under the law.

The judgment of the trial court is therefore reversed, and a new trial awarded.

MATSON and BESSEY, JJ., concur.