## BERT BEST v. STATE.

No. A-5316.   Opinion Filed Feb. 9, 1926.
(242 Pac. 1063.)

H. B. Reubelt and Clark Nichols, for plaintiff in error.

George F. Short, Atty. Gen., and G. B. Fulton, Asst. Atty. Gen., for the State.

DOYLE, J.  The information in this case was filed in the district court of McIntosh county on the 30th day of September, 1923, charging appellant, Bert Best, with the murder of William N. Scholl, alleged to have been committed September 8, 1922, by shooting him with an automatic pistol.  The case came to trial on November 13th, and resulted in a conviction of manslaughter in the first degree, and assessing appellant's punishment at confinement in the penitentiary for a term of 4 years.

He has appealed from the judgment rendered on the verdict, and assigns as error that the verdict is not supported by sufficient evidence; that for this reason the court erred in overruling his motion for a new trial. No brief has been filed, and, when the case was called for final submission, it was submitted on the record and the oral argument of counsel for appellant.

It appears that defendant and deceased were both farmers, occupying adjoining farms, and had for a few days prior to the shooting been having trouble over a fence near defendant's place.  The defendant went to the field where deceased was husking corn, and warned him to keep his cattle away from a water hole which defendant claimed was on his premises.  The next day deceased rode up to where the defendant was building a fence between deceased's pasture and the water hole. He got off

and tied his horse, and walked towards defendant, and defendant shot him with a pistol. The bullet entered the breast on the left side between the first and second ribs. Deceased never spoke after the shot was fired. The deceased was unarmed.

Paul Haun testified that he was looking for some of his cows, and saw Mr. Scholl driving a bunch of cattle about a quarter of a mile beyond him and rode towards him. That deceased went over a hill out of his sight, and, when he reached where the cattle were, he heard a shot, and rode on, and saw Mr. Scholl's horse with the reins over the fence. Defendant was standing nearby with a pistol in his hand. Mr. Scholl was lying there on the ground. That defendant motioned him to come down, and said, "Bill Scholl came down here to run me out, he went to his hip, and I shot him." That defendant's 15 year old son was there with him. That he went after a doctor, and when he returned Hogue Best, defendant's brother, was standing there with him.

Arthur Brannon testified that he and the defendant were to pasture their stock together on the north side of the water hole. That he rode up there that morning, and defendant was starting this fence. Defendant said, "I went over to see Bill Scholl about those cattle bothering me, and he reared up, and I told him I intended to fence this water hole." That witness said, "It will take a pretty good fence to hold them," and rode on. That the fence defendant was putting up was simply to fence up the water hole which was near a lane that Mr. Scholl had between his pasture fence and his field fence.

Frank Kirby testified that he went with Deputy Sheriff Kirkpatrick to the scene of the shooting, and found several persons there. That they examined the body, which was dressed in a union suit, duck pants, and jumper, and

found a little knife, a wooden husking peg, and some tobacco in the pockets of the jumper.

As a witness in his own behalf the defendant testified that he had lived in the same neighborhood with Mr. Scholl about 12 years, and that Mr. Scholl's reputation in that community as to being a quarrelsome, overbearing, and dangerous man was bad. That to his knowledge Mr. Scholl "carried a pistol a good deal." That Mr. Scholl's cattle would get in the lane there and over to this water hole on defendant's place. That he went down to ask him to help fix the fence so they would not break in. Mr. Scholl was gathering corn. He told him he wanted him to fix the partition fence. Mr. Scholl said, "To hell with you, it is mighty little of you to ask me to do such a thing. Grass and water and a free range is all outside." And he said, "I have been thinking about taking that fence out anyhow, and now I will damn sure take it out." That he told Mr. Scholl that it would force him to fence it, and rode away. That the next morning he was fixing the fence, and saw Mr. Scholl riding towards some cattle. That his dogs ran up there, and they bothered the cattle, and he hollered at his dogs. That Mr. Scholl came on as fast as he could, got off, and tied his horse, and said, "You are doing something I am not going to stand for," and came through the wire. That witness said, "Don't come down here to run me," and he came right on in a long walk, and says, "You are doing something I ain't going to stand for, me or you will have to leave here." Witness said, "You don't mean to run me off my premises," and Mr. Scholl said, "One of us will damn sure; we both can't stay here; one of us will have to die," and "he threw his hand back to his hip pocket, and I shot him."

Several witnesses testified that the deceased had the reputation of being a quarrelsome and dangerous man.

In rebuttal several witnesses testified that the reputation of the deceased in that community as to being a peaceable and law-abiding citizen was good.

Our Penal Code provides that homicide is justifiable when committed by any person in resisting any attempt to murder such person or to commit any felony upon him, or when committed in the lawful defense of such person, when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished. Section 1754, C. S. 1921.

In order to justify the assault and to slay an assailant, within the meaning of this section, there must be an apparent design on the part of such assailant to either take the life of the person assaulted or the infliction of some great personal injury, and, in addition thereto, there must be reasonable ground for believing that there is imminent danger of such design being accomplished. The use of a deadly weapon is justifiable for the purpose only of preventing an unlawful and violent attack on one's person of such a nature as to produce a reasonable expectation or fear of death or great bodily injury about to be inflicted.

There may be circumstances under which one violently attacked by another who is unarmed will be justified in using a deadly weapon in his defense, such as great disparity in years, or one greatly his superior physically. Ordinarily, the mere fact that one is approached in a threatening manner by another who is unarmed and who is not his superior physically will not justify him in using such a weapon. Roddie v. State, 19 Okla. Cr. 63, 198 P. 342.

The right to take another's life in self-defense is not to be tested by the honesty or good faith of defend-

ant's belief in the necessity of the killing, but by the fact whether he had reasonable grounds for such belief. If he kills his assailant, he does so at his peril, and, where defendant shoots and kills an unarmed and defenseless man, it is for the jury to say whether under the circumstances of the case he could justifiably resist the assault with a deadly weapon.

From all the evidence in the case, carefully considered, it would seem quite plain that this case was one for the consideration of the jury. The trial was in all respects fair, and we think defendant ought to be thankful that the jury dealt so leniently with him.

The judgment appealed from is accordingly affirmed.

BESSEY, P. J., and EDWARDS, J., concur.