## ONEY KNIGHT v. STATE.

No. A-7464. Opinion Filed Nov. 15, 1930.
(295 Pac. 409.)

J. P. Crawford, J. D. Crawford, and U. G. Winn, for plaintiff in error.

J. Berry King, Atty. Gen., and Edward Crossland, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter called the defendant, was convicted of the crime of murder and sentenced to life imprisonment in the state penitentiary. Motion for new trial was filed, considered, overruled, and exceptions saved, and the case appealed to this court.

The testimony on behalf of the state in substance shows that on the 2d day of April, 1928, Alfred Jackson was killed, and defendant was charged with the killing. The testimony of the state tends to show that on the day prior to the killing at night the defendant and deceased had been together, and had driven to Coalgate and other places, where it is claimed they drank whisky and beer; late in the evening they were at Centrahoma; the next morning the defendant drove to the home of Mr. Rowe, and stated to some member of the family he had killed a man; when he left the Rowe home, he was accompanied by Mamie Rowe, a daughter of Mr. Rowe; later the daughter returned home with a brother-in-law of the defendant, and the defendant was arrested charged with the murder of the deceased Alfred Jackson.

The defendant testified in his own behalf and admitted he was with the deceased during the day, giving in detail the places they went and where they secured drinks; then testifying some stranger was with them, and that they finally drove from place to place until they reached the schoolhouse where the remains of the deceased were found in the storm cellar, and stated:

"The deceased got out of the car and took me and started toward the cellar, having hold of me with his left hand, with a gun in his right hand, and when we got to the cellar door the deceased told me he was going to put me in the cellar where I would never come out; we got into a scuffle and I got hold of the hand of the deceased and twisted it around and the pistol was discharged, and the deceased fell into the cellar; the strange man, with a gun on me, told me to leave at once and get out of the country and not to come back."

The defendant has assigned several errors alleged to have been committed by the court in the trial of his case.

The only error it is deemed necessary to consider is the ninth assignment, which is as follows:

"Irregularities committed in the trial of said cause on the part of Honorable P. L. Gassaway, district judge of the 26th Judicial District, of the state of Oklahoma, in which the defendant was tried, in this, to wit:

"A. That the said P. L. Gassaway, after having voluntarily disqualified himself in the trial of this case proceeded to and presided in said cause by causing the jury to be sworn and excusing a number of the jury for reasons suggested by members of the jury, before surrendering the chair to Honorable Arthur G. Sutton, special district judge, assigned to try this defendant.

"B. That because the said P. L. Gassaway, during the examination of the defendant and during the trial of this defendant came into the court room and set with counsel for the state and was in frequent communication and consultation with the counsel for the state during the trial of said cause and during the introduction of the state's testimony, against this defendant.

"C. That the said P. L. Gassaway, as testified by him upon cross-examination when introduced as a witness for the state, aided, abetted and assisted the state's attorney and in every way participated in the prosecution of this defendant and in frequent communication with the counsel for the state and with the deceased relatives and immediate members of the deceased family. And was so aiding, abetting and assisting counsel for the state in the selection of the jury, to all of which action of the district judge, P. L. Gassaway, was contrary to law, prejudicial to the rights of the defendant and prevented this defendant from having a fair and impartial trial."

Judge P. L. Gassaway, who was the regularly elected, qualified, and acting district judge of the district comprising Coal county, certified his disqualification, and Arthur G. Sutton was assigned as special judge to try the

case. In the trial of the case Judge P. L. Gassaway was called as a witness on behalf of the state, and the defendant objected, for the reason that Judge Gassaway was the regular district judge for the district in which the case was being tried, and that it was improper for the judge to testify in the case, that the judge had also taken part in the trial of the case, and for that reason the defendant did not have a fair and impartial trial.

The record shows that Judge Gassaway was called as a witness on the application for change of venue, and testified he believed the defendant could have a fair and impartial trial in Coal county. Later he was called as a rebuttal witness. That part of his testimony that it is deemed necessary to set out in this opinion is as follows:

"I reside at Coalgate, Okla.; have resided there for 14 years; I am district judge of this judicial district at this time; I knew Alfred Jackson, he was commonly known as Jack Jackson; had known him intimately for about 12 years; I visited his grave last night; Dr. Cody, of Centrahoma, Butch Jackson, Tom Jones, a gentleman named Youngblood, and two other men whose names I can't recall; with the assistance of these men we opened the grave, and opened the casket, and Dr. Cody removed the bullet from the head of Jack Jackson; his body had been embalmed and was in a good state of preservation with the exception of some water in the casket; I recognized the body as being the body of Jack Jackson; Elmer Sherill and another gentleman, whose name I can't recall, and myself assisted Dr. Cody; when Jackson's skull was opened we found the bullet; I have the bullet now; the bullet is in the same condition it was when taken from the skull of the deceased with the exception that I washed it off; there were particles of brain clinging to it when taken from the skull."

The bullet was offered in evidence, and the defendant excepted, for the reason, first, that it was proper evi-

dence in chief, and that the defendant had closed his evidence and this evidence should have been introduced in chief; second, that it was not proper rebuttal, did not prove or disprove, or tend to prove or disprove, any material fact proven by the defense in the case; and, third, for the further reason that the action taken on the part of the state in having the body of the deceased raised and the bullet extracted, as we are informed and verily believe, was done without an order of the court and without the knowledge of the defendant in this case. The objection of the defendant was overruled, and defendant excepted.

On cross-examination the witness gave the following testimony:

"Q. Judge, have you ever—Are you a practicing physician? A. No, sir; I am not.

"Q. Have you ever had any special training in surgery? A. I have not.

"Q. You hold no diploma from any medical school as a physician or surgeon? A. I certainly do not.

"Q. And, Judge Gassaway, I believe you stated you are the present regularly elected, qualified and acting district judge of this district? A. I am the district judge of this district. However, I am not acting in this case.

"Q. I understand. But you are the regular district judge? A. Yes, sir.

"Q. And you have been present during the trial of this case? A. Yes sir, I have. I was subpoenaed here by the defendant.

"Q. You were subpoenaed here by the defendant. By the state, too, weren't you? A. No, sir; I wasn't.

"Q. If the record shows you were subpoenaed by the state, it was an error? A. There has been no subpoena

served on me by the state. The record might show that. I don't know.

"Q. You were not used as a witness by the defendant? A. No, sir.

"Q. And you are by the state? A. Yes, sir.

"Q. You have been present in the court room during the trial of this case? A. Yes, sir; I have.

"Q. You have been in consultation—in conference, from time to time with the counsel for the state? A. I have.

"Q. And with the deceased's relatives? A. Absolutely, sir.

"Q. And I will ask you to state who it was that suggested the taking up of the body of the deceased? A. I did.

"Q. You suggested it. To whom did you suggest it? A. I suggested it to Judge Tries.

"Q. Judge Tries is the special assistant prosecution in this case? A. Yes, sir.

"Q. And at your suggestion, it was agreed that the body should be taken up and that the bullet, if any, should be extracted? Yes, sir.

"Q. And you went with the other members—gentlemen mentioned by you, to take up the body? A. Yes, sir; I did.

"Q. And you performed the acts just related by you in taking the bullet out? A. Yes, sir.

"Q. And you are, therefore, interested in the prosecution of this case? A. I certainly am.

"Q. You are? A. Yes, sir.

"Q. You have been doing what you could, in a private capacity to bring about and procure the conviction

of the defendant? A. I have done what any good citizen would have done under like circumstances.

"Q. I am not asking you for an argument, Judge. A. I am answering your question.

"Q. I will ask you if you have done what you could, in a private capacity, to procure his conviction? A. I have.

"Q. You have an interest in this case? A. I have."

The record shows that Judge P. L. Gassaway called the regular panel of the jury for the term at which this defendant was tried, and impaneled the jury for the term, and discharged some of the members summoned to serve as jurors, and then vacated the bench, and Special Judge Sutton called the defendant's case for trial. It further shows that Judge Gassaway was disqualified to sit in the trial of the case, and, after he filed his disqualification, he then assisted the prosecution in the trial of the case, remaining in the courtroom the greater part of the time consulting with the state's attorneys trying the case; and suggested to the special counsel in the prosecution that the body of the deceased be exhumed and the bullet extracted, and then testified in rebuttal.

In Roddie v. State, 19 Okla. Cr. 63, 198 Pac. 342, J. W. Bolen, the regular district judge, was asked the following questions and gave the following answers:

"Q. During the progress of the trial did you take any active part in it? A. Not so very active. I did a few things, not very many.

"Q. Now when the jury was drawn for the trial of this case, they were summoned to be here on Monday morning? A. Yes, sir.

"Q. At which time you opened court and discharged the jury? A. Until Tuesday.

"Q. Did you participate in the trial to the extent of assisting in the selection of the jury? A. I made some suggestions.

"Q. Did you write (producing a note which read as follows) : Lee Nettles and John Whitaker are good friends of John Ralls and will never believe he fired a shot? A. Yes, sir."

This court held the action of Judge Bolen was reversible error.

Section 4093, C. O. S. 1921, is as follows:

"No person shall practice as an attorney and counselor at law in any court of this state who is not a citizen of the United States, or who holds a commission as judge of any court of record, or who is a sheriff, coroner, or deputy sheriff; nor shall the Clerk of the Supreme Court, or the clerk of the district court, or probate court, or the deputy of either, practice in the particular court of which he is clerk or deputy clerk; but nothing herein contained shall prevent any judge of any of the courts of this state from finishing any business by him undertaken in the district, circuit or Supreme Court of the United States, prior to his election or appointment as judge; and an alien who has declared his intention to become a citizen of the United States may practice as if he were a citizen."

By the provisions of the statute the law aims, as far as possible, to give the accused a trial that shall not only be fair but free as may be from any suspicion or partiality or undue influences.

In order to arrive at a correct understanding of the meaning of the statute prohibiting the judge of any court of record from practicing law in this state, we are privileged to inquire as to the nature and character of the evils it was intended to prevent. It is apparent that one of the objects of the adoption of the statute was to separate the judge personally, as well as officially, from all

that manner of life so calculated to destroy impartiality of judgment and balance of temper which may and does sometimes influence the lawyer. But this does not appertain altogether to the interest of the public, and, if it were all, it could scarcely be considered grounds for a reversal of the judgment against the defendant, but this we think is not all of it, but, as contended by the defendant's counsel, the known official position of the judge, and the general confidence reposed in the personnel of the judge by the masses, is such as to make his words and actions of far greater weight than the words of men occupying a merely private or professional situation.

It is quite true the official position would not have any tendency to render the opinions or argument of counsel intrinsically any more sound or plausible, but, when they were addressed to the jury, or the jury saw the interest the regular judge was taking in the trial of the case on behalf of the state, whose members were accustomed to receiving and obeying the instructions of the judge, it is not unreasonable to suppose that circumstances may, insensibly in the minds, have given to them additional force and influence. Such an influence even the best juror would have found it sufficiently difficult to be on guard against; and quite as difficult, perhaps, as they would to throw off or lay aside such preconceived opinions of the merits of the case as would have disqualified them as jurors. It cannot be said, therefore, that this is a matter of indifference to the person on trial. It is altogether easily to be conceived that the same thoughts were reasonably in the minds of the framers of the statute. We think that any other theory would be a dangerous one to approve and put into practice. We have no doubt that whatever connection with the trial is forbidden by the statute on the ground of public policy the party concerned

may except to, and that he has the right to insist upon his exception where it has reference to a breach of a statute enacted for the direction of the highest officer of justice as of one for the lowest; the correctness of the motive and high standing and upright character of the officer concerned cannot be considered on such an exception and consequently be an answer to it. There can scarcely be any doubt that public policy forbids a judge to practice law, or to assist, or counsel, to appear, or take part in any way in the trial of the case. The impropriety of a judge leaving the bench and appearing as counsel in a criminal case on trial in his own court, or aiding, suggesting, or advising counsel in charge of the prosecution, is perfectly apparent, and could not do otherwise than prejudice the substantial rights of the defendant. A similar question to the one in this case was in Roddie v. State, supra, and in Lilly v. State, 7 Okla. Cr. 284, 123 Pac. 575, Ann. Cas. 1914B, 443, in which this court said:

That "when the judge of a court of record vacates the bench and prosecutes a person charged with crime in a court over which he presides and before a jury drawn and impaneled by him, a judgment of conviction had under such circumstances will be reversed."

In the view we take of this record it is not necessary to consider the other errors assigned. The question already discussed is sufficient to dispose of the appeal.

From a careful examination of the whole case, and for reasons hereinbefore stated, we are clearly of the opinion that the defendant did not have that fair and impartial trial to which he is entitled under the law.

The judgment of the trial court is therefore reversed, and a new trial awarded. The warden of the penitentiary will deliver the defendant to the sheriff of Coal county for

such further proceedings as may be determined by the district court of said county.

EDWARDS, P. J., and CHAPPELL, J., concur.