David Lee **HOUSEHOLDER**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. A–15875.

Court of Criminal Appeals of Oklahoma.

Sept. 29, 1972.

Don Anderson, Public Defender, Oklahoma County, for appellant.

Larry Derryberry, Atty. Gen., Sondra Leah Fogley, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellant, David Lee Householder, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Oklahoma County, Oklahoma, for the offense of Kidnapping for Purposes of Extorting a Thing of Value or Advantage; his punishment was fixed at ten (10) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Nelda Denning testified that on August 29, 1969, she was employed as a real estate broker in Oklahoma City. At approximately 7:00 p.m. she returned home and found a note to the effect that a man wanted to see a house at 71st Street and MacArthur. She arrived at the address at approximately 7:30 p. m. and unlocked the house. She checked the other houses in the block and proceeded to the company field office. After making a telephone call home, she left the office and observed a man in a white Ford parked behind her car. The man, whom she identified in court as the defendant, got out of his car and told her that he wanted to look at two of her houses on Comanche Avenue. They looked at several houses, each driving their own car. The defendant suggested that they return and look at the house at 71st Street and MacArthur. It was still daylight as they arrived, she parking in front and the defendant in the driveway. They examined the interior of the house and the defendant suddenly started hitting her about the face. He then tripped her, sat on her and tied her hands behind her back. He told her to stand in the corner of the bedroom and not to make a sound. He left a "split instant" and, returning with sheet strippings and rags, retied her hands, blindfolded her and stuffed rags down her throat. He took her to the garage, dragging her part of the way. He then proceeded to tie her legs and carried her to his car where she was placed in the trunk. They drove for some time on a pavement and then on what she thought was a dirt road. Defendant stopped the vehicle and placed her in the back seat of the car and drove a very short distance where the car became stuck. Defendant cut the cords from her legs and cut the seams of her panty hose with some type of sharp instrument. He then proceeded to bite the elastic around the legs of her underpants and then "sexually attacked me." (Tr. 31)

He then removed her from the vehicle and, after going several steps, she and the defendant fell down a ravine. The defendant then attacked her again. The defendant then cut a leg from her panty hose and wrapped it around her neck, choking her until she passed out. The next thing she remembered was hearing a lot of commotion and she managed to get her hands loose and pull down her blindfold. She climbed up the bank and encountered Mr. Nemecek and some boys. She was taken to the Police Station in Yukon and from there to the hospital. She testified that she had "a broken nose, crushed nose, a cracked jaw, a broken palate and just black and blue from the top of my head to the tip of my toes." (Tr. 38) On cross-examination it was established that some police officers brought a bunch of pictures to her in the hospital and that she was taken to the police station to view a lineup. On re-direct examination, she testified that she recognized the defendant from the scene of the crime, rather than from the lineup identification.

Orville Denning testified that he was the victim's husband. He identified certain pictures which he took of his wife at the

hospital on August 31, and September 2, 1969.

John Conner, Jr. testified that on the evening in question he, John Diehl and Allen Novy were going to Piedmont. On a detour, they observed a white 1965 Ford just after dusk partially stuck in a ditch. A man appeared and asked them to help him out. As they were pushing the car, Mr. Nemecek drove up and stopped. They got the car unstuck and the driver took off and proceeded about a quarter of a mile, whereupon he turned around and came back. He had a short conversation with Nemecek and "then took off again." He heard some noise in the bushes to his left and discovered Mrs. Denning. Her hands were tied, her clothes were torn and her face was "really swollen up." He identified the defendant in court as the driver of the Ford automobile. On cross-examination he testified that he was shown pictures of possible suspects which contained the defendant's picture prior to viewing a lineup. He testified that he was "pretty sure that it was him. I'm not—absolutely sure." (Tr. 109–110)

John Diehl testified that he was with Novy and Conner on the evening in question. He testified that he saw a 1965 white Ford off the left side of the roadway. He testified that the defendant stepped from the side of the car and asked if they would help get him out. They managed to get the defendant unstuck and the defendant took off down the road. Defendant returned, had a short conversation with Mr. Nemecek and then took off again. On cross-examination he testified that he obtained a tag number from the Ford automobile, which was given to the police; that he was shown pictures of various suspects, which included a picture of the defendant, prior to viewing a lineup. He further testified that the tag number was only a partial number.

Levi Nemecek identified the defendant as the driver of the white Ford. His testimony did not differ substantially from the account of Witnesses Conner and Diehl as

to what had transpired. He estimated that they found Mrs. Denning between 9:00 and 9:15 p.m.

For the defense, Kenneth Smith testified that he was furnished a partial tag number by one of the witnesses and attempted to trace it but was unsuccessful. He testified that he showed the State's witnesses pictures of the defendant along with pictures of other persons prior to a police lineup and that none of the pictures were persons appearing in the lineup except defendant.

Howard Blair testified that he was Mrs. Denning's employer. He testified that another employee, Allen Prince, had a white 1965 Ford.

Duane Prince was called by the defendant and testified that he owned a 1965 white Ford which he drove to work. To his knowledge, no one else had driven the automobile.

Detective Shimmels testified that he was involved in the investigation of the alleged rape-abduction of Mrs. Denning. He talked to the defendant who sent him to talk to certain persons at Clark Motor Company. He searched defendant's house and found "nothing." (Tr. 211)

John McWethy testified that on August 29, 1965 he was employed as a car salesman at Clark Motor Company used car lot. The defendant came to the used car lot at approximately ten minutes before nine on the evening in question. The defendant was driving a blue Malibu Chevrolet and looked at used cars for approximately fifteen minutes. He testified that he remembered the date because he was questioned by a police officer shortly thereafter.

The defendant testified that on the evening in question he went to Hollies Drive-In in downtown Oklahoma City at approximately 8:00 p.m. From Hollies Drive-In he went to the Clark Motor Company, arriving at approximately 8:40 p.m. He remained at the motor company for approximately twenty to twenty-five minutes and returned to Hollies Drive-In. He further testified that he was not in the 5900 block of Northwest 71st Street and had not seen

Mrs. Denning prior to first observing her in a courtroom. He denied ever having or driving a white Ford automobile and denied being near Piedmont on the evening in question. He admitted a prior conviction for assault.

Dr. Reynolds testified that on the night of August 29, 1969 he examined Mrs. Denning at the Baptist Memorial Hospital. He testified that there were no bruises or abrasions in the pelvic area and a sperm test was negative. On cross-examination he testified that it was apparent that she had been beaten up because of the bruises about the eyes and face. He testified that he did find sand and grass in the genital area. Because of her age, it was not possible to determine whether she had recently had sexual intercourse unless there were bruises or marks about the vagina or unless there was sperm in the vagina.

■ Defendant's first proposition asserts that the verdict is not supported by the evidence. We have consistently held that where there is competent evidence in the record from which the jury could reasonably conclude that defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a strong conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evidence and determine the facts. Jones v. State, Okl.Cr., 468 P.2d 805.

■ The next proposition contends that the punishment is excessive. Suffice it to say that the punishment imposed was the minimum provided by law and certainly does not shock the conscience of this Court.

■ The next proposition asserts that the prosecution made improper and prejudicial arguments to the jury. Defendant first objects to opening statement of the prosecuting attorney wherein he stated that the defendant committed oral sodomy upon Mrs. Denning. We need only to observe that the opening statement of the prosecuting attorney was not taken by the reporter and was not made a part of the record before this Court. In Crane v. State, Okl. Cr., 461 P.2d 986, we stated:

"* * * In considering (a), that the trial court erred in failing to grant a mistrial because of a variance between the Information and opening statement of the prosecuting attorney, we observe that this question is not properly before us for the reason that the opening statement of the prosecuting attorney was not incorporated in the record and we will not presume error from a silent record. * * *"

See also Potter v. State, Okl.Cr., 473 P.2d 337.

■ Defendant next objects to three remarks made by the prosecuting attorney in his closing argument. We observe that the record does not reflect that any objections were imposed to the alleged improper remarks, nor were exceptions taken to the court's ruling, nor was there a request made for a mistrial nor was the same argued in the motion for new trial. In Overstreet v. State, Okl.Cr., 483 P.2d 738, we stated:

"* * * We have previously held that if counsel wishes to preserve the record during closing argument of the State, that when an objectional statement is made by the prosecuting attorney, it should be called to the attention of the court by timely objection, together with a request that the jury be instructed to disregard the improper statement and in the event that the objection is overruled, an exception should be taken to the ruling of the court, preserved and argued in the Motion for New Trial. When this is not done, the matter cannot be presented for the first time in the Motion for New Trial and in the Petition in Error and briefs on appeal. In the event counsel for the defendant considers the remarks so fundamentally prejudicial that the court cannot, by instructions to the jury, correct such error, counsel for defendant should move for a mistrial and preserve this in the Motion for New Trial. Wal-

ters v. State, Okl.Cr., 455 P.2d 702. See also Robison v. State, Okl.Cr., 430 P.2d 814."

We, therefore, find this proposition to be without merit.

██ Defendant's next proposition contends that there was misconduct of the jury. The record reflects the following transpired:

"THE COURT: On this 13th day of February, 1970, Mr. Jess Horn, attorney, has requested to see me in the company of two women alleging certain possible irregularities in connection with a jury trial which was tried before Judge La-Fon this week in which the defendant, David Lee Householder, was convicted of the crime of kidnapping.

"Now what is it you want to tell me?

"MR. HORN: Judge, I don't know, and this lady, I don't even know her name, but it has to do with the fact that she heard a statement that a juror made in the coffee shop I believe on Monday.

"MRS. WILLIAMS: Tuesday.

"THE COURT: That is the coffee shop on the ground floor of the Courthouse?

"MRS. WILLIAMS: The new side on the ground floor in the coffee shop.

"THE COURT: And what statement did you overhear?

"MRS. WILLIAMS: She talked to me about the case.

"THE COURT: Were you a member of the jury?

"MRS. WILLIAMS: No, sir, I had not been called on a case until that morning later.

"THE COURT: Was this woman who talked to you about the case a juror on the case?

"MRS. WILLIAMS: Yes, sir.

"THE COURT: Do you know her name?

"MRS. WILLIAMS: No, sir, but I observed some of the trial and I know where she sat on the witness stand, on the jury box.

"THE COURT: Where did she sit in the jury box?

"MRS. WILLIAMS: Toward the wall on the end near the door, the outgoing door.

"THE COURT: In other words, that would be in the second row on the end nearest the door?

"MR. HORN: I have that name if that would help you.

"THE COURT: Who was sitting there?

"MR. HORN: L. P. Killough, 208 West Glenhaven Drive, Midwest City, Oklahoma.

"THE COURT: And on this Tuesday which was the 10th of February, 1970, what did this juror say to you?

"MRS. WILLIAMS: Do you want all of the conversation or just what she said to me?

"THE COURT: Well, what you overheard that you think was relevant to this Householder trial.

"MRS. WILLIAMS: She said this lady got up and said he chewed on her panties and he committed sodomy and I asked her what that was and she kind of looked at me and smiled, and I said Oh, I think I know—no, she told me to get out my dictionary and look it up, and I said I think I know, and she patted her finger and said and he raped her twice, and that's all.

"THE COURT: And what time of the day did this occur?

"MRS. WILLIAMS: It was about eight-fifteen.

"THE COURT: In the morning?

"MRS. WILLIAMS: In the morning.

"THE COURT: And was this apparently evidence that she had heard in the case?

"MRS. WILLIAMS: She had heard that woman the day before, Monday.

"THE COURT: What else, if anything, did she tell you relating to the case?

"MRS. WILLIAMS: Well, she told me he bound and gagged her and took her to this deserted place and proceeded to do all these horrible things.

"THE COURT: Well, in other words, this witness was relating the testimony she had heard; is that correct?

"MRS. WILLIAMS: Yes, sir, right.

"THE COURT: And what is your name?

"MRS. WILLIAMS: Patricia Williams.

"THE COURT: You were also on this jury panel?

"MRS. WILLIAMS: No, sir, I wasn't.

"THE COURT: I mean on the entire panel. You were not sitting as a juror in the case?

"MRS. WILLIAMS: Right.

"THE COURT: And what is your address?

"MRS. WILLIAMS: 4844 Woodview Drive in Del City.

"THE COURT: Mr. Horn, is there anything else you think the Court should be advised about relating to the matter?

"MR. HORN: I didn't know what was going to be said. I found out at the same time you did, but I would like to ask the lady if there was any indication from what the lady said if she had had her mind made up about the case?

"MRS. WILLIAMS: Yes, I think she did.

"THE COURT: When did this trial start, Mr. Horn?

"MR. HORN: It started Monday morning and ended Wednesday evening at around five o'clock, Monday, the 9th of February, and went to the jury for their deliberation the 11th which would have been Wednesday at around two forty-five in the afternoon I believe.

"THE COURT: Very well, I am going to have this transcribed and see that the Judge who tried the case is apprised of the statements that have been made in my chambers relating to the case." (Tr. 407–411)

The record further reflects that a transcript of the above proceedings in Judge Myers' chambers was read to the trial judge, Judge Ben LaFon, prior to the sentencing hearing on February 16, 1970. Defendant did not subpoena any of the jurors, including Mrs. Killough, nor did he request a continuance to subpoena the jurors. In Muller v. State, Okl.Cr., 456 P.2d 903, we stated in the first syllabus:

"In a criminal case where misconduct of the jury is alleged, if the misconduct occurred before the case is finally submitted to the jury, the burden is on the defendant to show that the alleged misconduct was prejudicial to him. Where the alleged misconduct occurs after the case is finally submitted to the jury, prejudice is presumed, and the burden is on the state to show that no injury could have resulted therefrom to the defendant."

In the instant case, the alleged misconduct occurred before the case was submitted to the jury, thus placing the burden on the defendant to show that the alleged misconduct was prejudicial to him. Defendant has totally failed to meet this burden. The evidence on behalf of the defendant in its best light reflects an unsworn statement that a juror related the testimony she had heard the previous day to another member of the entire jury panel and that, in the opinion of the other panel member, the juror had her mind made up about the case. We are of the opinion that this evidence is not sufficient to meet the burden placed on the defendant to show that the alleged misconduct was prejudicial to him. We, therefore, find this proposition to be without merit.

The final proposition concerns the in-court identification of the defendant. Defendant candidly states in his brief that:

"Notwithstanding the absence of any hearing by the trial court as contemplated in *Thompson*,[1] supra, no error would

---

1. Thompson v. State, Okl.Cr., 438 P.2d 287.

seem to appear here, since trial counsel's effort was directed toward impeachment of the witnesses by reason of having seen the pictures rather than any improper lineup as such. * * * "

We therefore, find this proposition to be without merit.

In conclusion, we observe the record is free of any error which would justify modification or require reversal. The judgment and sentence is affirmed.

BRETT, J., dissents.

SIMMS, J., specially concurs.

BRETT, Judge (dissents).

I must respectfully dissent to the Court's decision in this case. I candidly admit that at the outset I believed the plaintiff in error, David Lee Householder, who will hereafter be referred to as defendant, was guilty of the crime for which he was convicted. But after carefully considering the record of trial before the Court, I became convinced that great possibility exists that the identification was so faulty that the wrong man may have been convicted.

It became necessary to consider the record of this conviction when Householder v. Ramey, Okl.Cr., 485 P.2d 247 (1971) was before the Court. However, that review of the record was not as extensive as is required when considering this appeal. Consequently, my initial view was changed. There are too many unanswered questions for me to believe the identification of this defendant was properly accomplished. Why did it seem so difficult for the prosecuting witness to identify the defendant? Why was she unable to pick out his photograph? The uncertainty of the four men is likewise not without some question. Why was the state so reluctant to offer the testimony of the police officers? Why wasn't all the evidence offered at the defendant's trial? Why did the prosecutrix want her brother called instead of her husband? These questions remain unanswered.

Mrs. Nelda Denning was a real estate saleswoman, whose duties required that she show homes listed for sale with the Howard Blair Company. She testified that on August 29, 1969, a man called her home and left a request for her to show several houses for him that evening, in the vicinity of 71st Street and North MacArthur Boulevard in Warr Acres. The information indicated that the man would be driving a white Oldsmobile, but instead about 7:30 P.M. a man drove up in a white Ford.

On the date this crime was committed, Daylight Savings Time was in effect, so it was possible to show several houses before it became dark. Mrs. Denning related that she and the man went to several houses, each driving their own automobile. Finally, the man suggested that they look at the house at 5900 Northwest 71st Street; so they proceeded to that location, where she parked her car in front of the house, and he drove his car into the driveway. They went through the house, as usual, until they reached the bedroom area. She related that the man suddenly struck her in the face three times, tripped her, and sat on top of her, while he tied her hands behind her back. He then went to his own car, obtained some strips of cloth and returned to re-tie her hands, blindfolded her, and tied a gag in her mouth. As they were walking to the garage she slipped on the tile floor, so the man dragged her into the garage and tied her feet together. He then loaded her into the trunk of his car and left the vicinity.

Mrs. Denning related that they drove on a paved road and then on a dirt road; that he stopped the vehicle once and opened the trunk, but closed it again; he stopped another time, but did not open the trunk; the third time he stopped the vehicle he took her out of the trunk and placed her in the back seat of the car. He drove a short distance further and the vehicle became stuck on high-center on or near a side ditch. She said that he took her out of the car, cut the cords around her ankles and cut the crotch seam of her panty hose and

under pants with a sharp instrument, after which he had sexual intercourse with her. She said he took her out of the car and told her they were going down the road, but after he took a couple of steps he fell down a ravine without releasing his hold on her. She related that he re-tied the gag on her mouth and had sexual intercourse with her a second time, after which he reached up under her dress and fondled her breasts; the next thing she remembered was his telling her he was going to tie her head to her feet and then get the car unstuck. She said he cut one leg of her hose off and attempted to tie it to a cord so that it would reach from her neck to her ankles, but the cord broke; so he tied the stocking around her neck and tightened it, strangling her until she passed out.

Mrs. Denning related that when she regained consciousness, she heard some commotion and voices above her and managed to get her hands free and remove the gag in her mouth and untie her feet. She said she was afraid to call out because that man might still be there, so she struggled through the brush and up the bank, when suddenly a flashlight shown on her. The flashlight was held by Mr. Levi Nemecek, and there were three other young men with him. They helped her up the bank and a short time later Mr. Nemecek took her to the police station in Yukon, Oklahoma. Later she was examined by a physician at Baptist Hospital in Oklahoma City. This witness testified that there was sufficient light for her to see the man, while she was showing him the houses, and that she could identify the man by his voice. She identified the defendant as being the man. The identification of this defendant is considered in defendant's fourth proposition.

Orville Denning testified that he was Nelda Denning's husband; and he identified some pictures as having been taken of her on August 31st and September 2, 1969, while she was in the hospital.

John Conner's testimony revealed that he, John Diehl and Allen Novy were in route to Piedmont, Oklahoma on the evening in question when they came upon the 1965 white Ford stuck in a ditch. He related that a man appeared and asked them to help him with his car, which they did. As they were attempting to get the car unstuck, Mr. Nemecek drove up. Mr. Conner related that after the vehicle became unstuck, the man drove East about a quarter of a mile, turned his car around, returned and stopped; that they had a few words with him, after which the man drove off at a pretty high speed. He said that while they were still in the vicinity they heard a noise in the bushes and discovered Mrs. Denning; he said, ". . . then we could see she was tied up and everything." He related that her clothes were torn and her face was badly swollen on the left side. They helped her out of the ravine, or bar ditch, and shortly thereafter Mr. Nemecek drove her to the Yukon Police Station. Mr. John Diehl's testimony and Mr. Nemecek's testimony was substantially the same as that of Mr. Conner. However, Mr. Nemecek related that Mrs. Denning wanted him to telephone her brother, instead of her husband, about the incident.

All four men identified the defendant in a police lineup, after having been shown a group of several photographs which included the defendant's photograph. These witnesses also identified the defendant in court, as being the man whom they helped on the country road near Piedmont, Oklahoma. This was the third or fourth time the witnesses had testified concerning these circumstances, including the preliminary examinations and a trial in Canadian County, for another offense which arose out of the same circumstances. None of the materials with which Mrs. Denning was tied were introduced into evidence. Likewise, the state did not show that this defendant owned, or drove, a white Ford, except by this testimony.

The defendant testified in his own behalf and offered the testimony of another witness, who was a car salesman at the Clark Motor Company, Mr. John Mc-Wethy, who related that the defendant was

in his used car lot about 8:50 that evening. Defendant also called the two police detectives in an effort to disclose the manner in which the police lineup was conducted; he called as witnesses Mr. Howard Blair, the owner of the real estate company, and another of the employees, Mr. Duane Prince, who drove a white Ford. Defendant recalled the complaining witness, and also offered the testimony of the doctor who examined Mrs. Denning.

Detective Smith proved to be a reluctant witness for the defense and either intentionally, or through inadvertence, left his notes at the police headquarters. He was excused to return later in the afternoon with his notes; however, he related that he attempted to run-down the partial license tag number, given to him by the four men, but without success. He stated that defendant was the only person in the lineup whose picture was among the several photographs he showed the witnesses before the lineup was conducted. He related that Mrs. Denning first had Larry Nichols, a white male about the same physical description as defendant, step forward, but later identified the defendant. However, it appears that Nichols' picture had not been shown to Mrs. Denning. The officer did not talk with Mr. McWethy, but Officer Shimmels did. He related that no effort was made to lift fingerprints in the house at 5900 Northwest 71st Street, where the man allegedly attacked and bound Mrs. Denning.

Officer Shimmels was asked on direct examination by defense counsel if he searched defendant's house, but the objection was sustained as being leading. Later counsel managed to get into evidence that defendant's house was searched, but nothing incriminating was found; it appears however, that the business card of Larry Walton was found in the waste paper container in defendant's house. Officer Shimmels talked by telephone to Larry Walton, who also worked at Clark Motor Company, after defendant told him he was at the Clark Used Car Lot on the evening in question. Mr. Walton referred the officer to John McWethy, and he talked with McWethy in person.

On direct examination Mr. John McWethy testified that on the night of August 29, 1969, at about ten minutes before nine o'clock, the defendant drove into the car lot in a blue Malibu Chevy; that they usually closed the lot at nine o'clock, but he talked to defendant while Mr. Walton gathered up the car keys in the lot. He related that the lot was closed that night about five or ten minutes after nine. When asked how he recalled the incident, he related that on the following Tuesday a police officer inquired concerning the matter; that the officer had a photograph of the defendant and he recognized the man as being the one he talked to concerning a car that night. He said the officer also had another of the salesman's cards with him. Mr. McWethy related that he did not talk with the defendant the following morning, because he was not there; but he related that Larry Walton did talk to him, which accounted for Walton's card being found in defendant's house.

Defendant testified that on the night in question he was not at the house on Northwest 71st Street, as related by Mrs. Denning; that he did not have any occasion to drive or have in his possession a 1965 or 1964 white Ford. He related that about eight o'clock that night he was at Hollie's Drive-In, located at Sheridan and Western, and an Indian girl served him in his car; that he went to the Clark Motor Company after he finished eating at about eight forty-five P.M.; after that he went back to Hollie's Drive-In and drank a Dr. Pepper, when he spoke to Mrs. Hollie. On cross-examination he admitted that in 1966 he plead guilty to a felonious assault charge and paid a fine. He related that he runs a lawn-mowing service in Oklahoma City in the summertime, and the remainder of the year he works at other jobs. That night his wife was baby-sitting for her sister, so he ate out and was in no particular hurry to get home, until he had to pick up his

wife about eleven o'clock P.M. He said, while accounting for his time, that about six o'clock P.M. he washed his car at a car wash at 26th and Classen; that at seven o'clock P.M. he got his shoes shined at a place in the three hundred block of West Sheridan Street, run by a fellow called "Sarge"; he related that he went to two other car places, but they were either closed or were closing, then he went to Clark's; on cross-examination he again denied being in the vicinity of Piedmont, Oklahoma, where the alleged assault occurred; he admitted that during the nine years he has had the lawn-mowing service, he probably has been in that vicinity, but not to put in new lawns. During the investigation of this case no inquiry was made of Mrs. Hollie, the Indian girl who worked at Hollie's Drive-In, or "Sarge," who operated the shine stand, to verify whether or not the defendant was at those places on the night of August 29, 1969.

Officer Smith was recalled and he related additional facts concerning the investigation and the lineup. He said that the police had about fifteen suspects in the case; and that he did show pictures of these people to Mrs. Denning, but none of them were included in the lineup. He said that he did talk with a person named Thomas Menthen, who drove a 1963 white four-door Ford. He related that he showed the witnesses from five to seven pictures, among which was the defendant's picture; it was during this time he explained the lineup procedures, and explained Mrs. Denning's apparent confusion in making her identification of the defendant. He explained ·that they used other prisoners in the lineup, but he gave no particulars concerning who was in the lineup, how many lineups were conducted, or who was present at the lineup. With reference to what the officer might have said to the witnesses, prior to the lineup, defense counsel attempted to show by a former transcript, when the officer testified, that in response to the questions concerning what he said to the witnesses prior to the

lineup, that he related "I don't recall"; whereas, at the trial he positively stated that he made no implicating statements to the witnesses about the defendant's former record.

The last witness called by the defense was the doctor who examined Mrs. Denning. He related that there was no sperm in her vaginal tract; that there were bits of grass and small particles of gravel; and that it was not possible to determine whether or not she had been "raped," because of her age, since there were no torn parts of her vaginal area. He did verify the contusions of her face and certain scratches.

Defendant's second numbered proposition complains about the prosecutor's opening remarks, when the prosecutor told the jury that he would prove that the defendant committed oral sodomy on the complaining witness, without proving the offense. Insofar as the record fails to contain the prosecutor's opening remarks, such may not serve as the predicate for reversible error. This Court held in Ragland v. State, Okl.Cr., 404 P.2d 84 (1965):

"The office or purpose of an opening statement is to advise the jury concerning the questions of fact involved, so as to prepare their minds for the evidence to be heard. The opening statement is not evidence, and the scope thereof should be limited to putting before the jury a detail of the testimony to be offered; and facts should not be stated which cannot be proved. However, the early case of Shacklett v. State, 23 Okl. Cr. 4, 211 P. 1063 has consistently been followed. In that case we said:

'Ordinarily, error cannot be predicated upon the opening statement of a prosecuting attorney to the jury, specifically stating what facts he expects to develop in testimony, where later, for some reason, he fails to introduce evidence to support some of the narrative related in the opening statement, unless such unsupported portions of

the opening statement were made in bad faith and were manifestly prejudicial.'" 404 P.2d at page 85.

However, this complaint, coupled with defendant's next proposition, which asserts misconduct of one of the jurors, causes some concern.

It appears that another woman on the jury panel, who was not a member of this trial jury, overheard a member of the trial jury discussing the trial in the coffee shop of the courthouse. She related that the juror told her, " . . . he chewed on her panties and he committed sodomy and I asked her what that was, and she kind of looked at me and smiled, and I said oh, I think I know—no, she told me to get out my dictionary and look it up, and I said I think I know, and she patted her finger and said and he raped her twice. . . . " Defendant argues that this is a clear instance of the juror making up her mind before all the evidence was heard, which was contrary to the court's instructions and was prejudicial to defendant.

The matter of the juror's misconduct was made known to the trial court on the day set for imposition of sentence, when the motion for new trial was heard. The testimony of the panel member was taken before Chief Judge William S. Myers, and was recorded by his court reporter. Counsel stated to the court that the panel member had contacted various judges and finally contacted him; and then counsel related, " . . . that juror [panel member] was brought to your office last Friday and you refused to see the lady, at which time she asked to go see Judge Myers with whom she had previously talked, and Judge Myers apparently sent her back to see you, and when you refused to see her, she went back to Judge Myers, and she saw Judge Myers and told him in my presence that Mrs. L. P. Killough, the juror who sat in the back row on the far end had made statements on Tuesday morning at sometime in the neighborhood of eight-fifteen, . . . about the seriousness of what the defendant had done and the fact that she

was convinced of his guilt at that early time." Counsel made further remarks and concluded his motion for new trial. The court inquired of the prosecutor, "Does the State want to confess the motion?" The prosecutor answered, "No." The court then overruled defendant's motion for new trial and imposed sentence.

The attorney general discounts the misconduct of the juror and the statement taken before Judge Myers, because the statement is not shown to be a sworn statement; and because the district attorney was not present at the hearing. Both briefs cite Roddie v. State, 19 Okl.Cr. 63, 198 P. 342 (1921) to support their positions. The significant statement from the Roddie case, pertaining to the jury, is as follows:

"Among the personal safeguards contained in section 20, art. 2, Const., is the right of the accused in a criminal prosecution to have 'a speedy and public trial by an impartial jury.' A jury being composed of 12 individuals, the misconduct of any juror, is misconduct of the jury, because the jury act as a unit, and misconduct by one or more of the jury which might have been prejudicial to the defendant raises the presumption in a capital case that the defendant has been prejudiced thereby, and the burden of proof would be on the state to show that as a matter of fact the defendant suffered no injury by reason of such misconduct."

When the possibility of a juror's misconduct arises, it is the duty of the trial court to inquire into the matter. From the record before the Court, it is apparent that no such inquiry was made by the trial court. Likewise, it is not necessary to consider whether or not this juror's misconduct was sufficient, standing alone, to cause reversal of defendant's trial, because it placed additional emphasis upon defendant's second contention. The record reflects that the prosecution witness did not testify that defendant committed sodomy on her; consequently, if the juror related

what she is purported to have said, she could have only gained that idea from the prosecutor's opening statement to the jury. If such be true, then the prosecutor's opening statement to the jury may have been prejudicial; and notwithstanding the absence of a transcript of that statement, the record appears to sufficiently reflect other facts from which to conclude such prejudicial statement might have been made. The time for holding an evidentiary hearing, to determine these facts which had a direct bearing on the question of due process, was at the time the assertions were made known to the trial court; but such hearing was not conducted in this case. On this review we are left to presume that defendant had a fair trial in accordance with due process of law.

Defendant was represented at his trial by Mr. Jess Horn, but at the time of his appeal he was declared to be indigent and on the appeal he is represented by the public defender. Defendant's fourth proposition complains of the in-court identification procedures followed at his trial, by pointing out certain discrepancies, but does not offer argument in support thereof. This complaint appears, however, to have been the main thrust of trial counsel's trial strategy; it was contained in his motion for new trial; and it was argued when his motion for new trial was presented. In his brief appellate counsel merely asserts that the trial court should have conducted a hearing outside the jury's presence for the purpose of making inquiry concerning the propriety of the police lineup. The record fails to reflect whether or not defendant had counsel present at the lineup, but it does reflect that no hearing was requested by defense counsel, and none was had.

In this case the state elected to stand on the eye-witness identification of defendant, and did not call any of the police officers connected with the lineup. Consequently, it became necessary for the defendant to subpoena the two police detectives who conducted the investigation and the police lineup. However, there is no showing in this record that defendant waived any of his constitutional rights; therefore, it seems logical to consider that defendant did not intentionally waive objection to the violation of any of his constitutional rights relative to the question of identification and his right to counsel at the lineup. Instead, the proper administration of justice requires that this question be resolved in defendant's favor, since waiver of constitutional rights may not be presumed. "Presuming waiver of counsel from a silent record is impermissible . . . ." Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962).

This Court provided in Thompson v. State, Okl.Cr., 438 P.2d 287 (1968):

"In all cases triable in Oklahoma after June 12, 1967, the admissability of the courtroom identification of a defendant by an eye-witness to a crime who has previously identified the accused at a lineup at which he was not represented by counsel or had not effectively waived the same, the court is bound by the rule enunciated in Wade v. United States, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149."

After asserting that an evidentiary hearing upon pretrial procedures would have been futile, the attorney general states in his brief: "The only other possible error which might have occurred concerning the identification of the defendant would have been the admission of testimony concerning the pretrial identification which, under the holdings in United States v. Wade, [supra]; and Gilbert v. California, 388 U.S. 263, 18 L.Ed.2d 1178, 87 S.Ct. 1956, are subject to a per se exclusionary rule unless the defendant was accompanied by counsel at the pretrial lineup. Although the record does not reflect, as the defendant's attorney seems to have presumed, that the defendant was without counsel at the pretrial lineup, at any rate any testimony concerning the pretrial lineup was brought out in cross-examination by defendant's attorney and, therefore, it is not reversible error under theory of the invited error rule."

The difficulty presented by this case and the attorney general's statement is that defense counsel was required to subpoena the police officers as his own witness in order to get into the record testimony of the questionable police lineup; therefore, this resulted in a lessening of his examination of the officers by precluding cross-examination. The record also shows that frequently when defense counsel attempted to challenge answers given by the police officers, by use of the record of preliminary examination, he was prevented by the state's objections. The same situation more or less prevailed when counsel was cross-examining the three witnesses who assisted some man, allegedly this defendant, get his vehicle unstuck, or off high-center, at the scene of the alleged rape. When he attempted to challenge the witness by use of the preliminary hearing record, the state's objections were most generally sustained, as being "argumentative," "repetitious," or as "invading the province of the jury." Consequently, this defendant was convicted by "eye-witness" testimony, which the record shows to be highly suspect, if not doubtful.

The United States Supreme Court said in United States v. Wade, [supra], while discussing the courtroom identification:

"Insofar as the accused's conviction may rest on a courtroom identification in fact the fruit of a suspect pretrial identification which the accused is helpless to subject to effective scrutiny at trial, the accused is deprived of that right of cross-examination which is an essential safeguard to his right to confront the witnesses against him. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed. 2d 923. And even though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute assurance of accuracy and reliability. Thus in the present context, where so many variables and pitfalls exist, the first line of defense must be the prevention of unfairness and the lessening of the hazards of eyewitness identification at the lineup itself. The trial which

might determine the accused's fate may well not be that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no effective appeal from the judgment there rendered by the witness— 'that's the man.'" 388 U.S. at page 235 87 S.Ct. at page 1936, 18 L.Ed.2d at page 1162.

While she was in the hospital, the complaining witness was shown several pictures, which included one of the defendant, but she was unable to identify any of them as being her assailant. Upon her request the police officers returned with color pictures of certain persons, including defendant's photograph, but it is not clear whether or not she identified any of those pictures as being her assailant. However, the middle of the following week she was taken to the jail on a stretcher to observe a police lineup; at that time the defendant was the second person she asked to step forward. This was later explained by Detective Smith when he testified. He said it was the result of her misunderstanding of the numbering of the participants in the lineup. He related that she asked for number "two" to step forward, when she intended for number "four" to be the one to step forward.

It is for this precise reason the United States Supreme Court considered the presence of an attorney at the lineup to be of such material significance. Had this defendant been represented by counsel at the lineup, the explanation would be more complete. Instead, only the prosecution's point of view is contained in the record before this Court. The record also clearly shows that of the five persons who appeared in the lineup, only the defendant's picture was shown the witnesses, before they viewed the lineup. Another confusing aspect of this record is that it is impossible to determine exactly how many lineups were conducted. It is important to know if a lineup was conducted for each wit-

ness; did the three men view the same lineup at one time; or did all the "eye-witnesses" appear at the same time to view only one lineup? From this record it is not clear. The fact which seems clear is that the defendant was the only person in the lineup whose picture had been shown to each of the witnesses prior to the time the lineup was conducted. Consequently, the eye-witness testimony becomes suspect.

The United States Supreme Court said in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968):

"It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." 390 U.S. at page 383, 88 S.Ct. at page 971, 19 L.Ed.2d at page 1253.

The three young men observed the man, whom they helped with his vehicle on the country road, for some fifteen minutes aft-er it had become dark. Mr. Nemecek arrived on the scene a few minutes later, but he was the most definite of those witnesses in his identification of defendant and related, "I got a good look at him, yes, sir, I sure did." But Mr. Nemecek was unable to state whether or not the man's face was pock-marked; but he assertedly could relate that the defendant was "sweating," and that he was "slick-shaved." However, Mr. Nemecek did admit that the first time he was shown the five or six pictures he could not positively identify this defendant as being the man he encountered. Later he was asked on cross-examination: "But you looked at the picture and you didn't identify him?" The witness replied: "I told him I couldn't be positive but it sure looked like the man." [Referring to the man he encountered on the country road.]

John Conner, Jr. was asked on cross-examination: "When the police called you and told you to come down to the police station and look at this man in the lineup, did they show you some pictures first?" He answered: "Yes, they did." He was then asked: "In looking at those pictures did you see a man in the lineup whose picture they had shown you?" He replied: "Yes." The next question was: "Did they show you a picture of anybody else in the same lineup?" He said: "No, they didn't." Defense counsel's effort to show the conflict between this witness' testimony at this trial and an earlier trial, was often prevented by the prosecutor's objections.

Mr. John Diehl testified on direct examination, ". . . I couldn't see his face very good because the door post was in the way." The prosecutor attempted to get the witness to admit he had clearly seen the man's face earlier, but the witness hedged in his answer. The prosecutor asked, "Did you have any trouble seeing his face before that?" but the witness answered, "Just with it getting a little bit dark." This witness also related that he was shown pictures at the police station, which contained defendant's photograph, before he viewed the police lineup; but pictures of

none of the other men in the lineup were contained in the group of photographs.

Insofar as the record is devoid of any showing on behalf of the state that defendant waived counsel at the police lineup, I can only conclude that defendant did not have counsel present, nor was he advised of his right to have counsel present; and because of the state of the record, in this respect, I cannot conclusively determine that the lineup, or lineups, were conducted in accordance with United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, or with this Court's decision in Thompson v. State, supra; nor can I determine whether or not the defendant was properly identified, even assuming that the lineup was properly conducted.

In United States v. Zeiler (3d Cir. 1970), 427 F.2d 1305, the Court said:

"In Wade the [United States] Supreme Court was concerned with the inherent danger of mistake in eyewitness identifications. It recognized suggestive pretrial confrontations conducted by the police to elicit identification evidence as a major cause of mistaken identifications. A witness once induced by such a suggestive confrontation into making a mistaken identification is extremely unlikely later to change his mind. The defendant, unrepresented at this critical pretrial identification proceeding, is severely hampered thereafter in ferreting out the elements of prejudice and reconstructing at trial what actually took place."

The third paragraph of the syllabus to United States v. Zeiler, supra, provides:

"Permitting each eyewitness at trials to testify on direct examination to having previously identified defendant during pretrial exhibition of photographs conducted after defendant was in custody without his counsel being present at exhibition was constitutional error requiring reversal of convictions. U.S.C.A. Const. Amend. 6."

The record before this Court is not clear whether the four men were shown photographs of the defendant before or after he was taken into custody; but it is amply clear that the defendant was in custody when the photographs were shown to the prosecuting witness; and that defendant's counsel was not present at that showing, or at the lineup held in the police station.

There also appears sufficient testimony in the record to indicate that there might have been prejudicial statements made by the prosecutor in his opening statement, whether made intentionally or not; and in relation thereto, the record reflects that there may have been misconduct on behalf of the jury. When these incidents were brought to the attention of the court, neither one was properly reconciled by the trial court. The absence of certain real evidence is also obvious, i. e. the bindings with which the prosecutrix was tied, the panty hose, the cord, etc. Much of the testimony pertaining to those items was offered by the prosecutrix; but she also testified she had been raped twice, which testimony was not borne out by the medical testimony. All of the foregoing was highly prejudicial to the defendant, which prevented him from receiving that due process of law guaranteed by the constitution. And finally, there was absolutely no showing that this defendant owned, or was in any way in possession of, a white Ford, except as referred to by the questionable testimony of the witnesses.

Therefore, after carefully considering the record before this Court, I am of the opinion that the judgment and sentence in this case should be reversed; and for the reasons heretofore stated, I am compelled to dissent to this decision.

SIMMS, Judge (specially concurring).

The writer of this special concurring opinion has likewise read, and closely scrutinized the record in the instant case as well as the record and opinions in Householder v. Ramey, Okl.Cr., 485 P.2d 247 (1971). The record was reviewed not for the purpose of second-guessing the jury, which heard the evidence and returned its

verdict on that evidence, but on the contrary, to ascertain whether the constitutional requirements of due process and equal protection were met. In reviewing the authorities and recitation of facts in the majority opinion, as well as my colleague Judge Brett's Dissent, the same are read in the posture of judge rather than advocate.

Certainly none of the three Judges of this Court, as it is now constituted, were witness to the alleged criminal activities of the accused nor the physical atrocities inflicted upon the alleged victim of the crime.

If then we are to follow the long and well established tradition of judicial process in this Republic, we are duty bound to examine the record for legal error, and, absent legal error, give credence to the verdict of the jury which observed the demeanor of the witnesses and who, upon sworn testimony, returned a verdict this writer believes to be conscientiously founded on sufficient evidence.

If we are to deviate from the long established practice of permitting jury verdicts to stand where there is sufficient evidence to support them, then the bed rock foundation of our criminal justice system, the right of trial by jury, diminishes into grains of sand which will shift with the winds of change.

If appellate judges are permitted to substitute their independent judgment for that of the twelve tried and true citizens who hear and determine a cause under proper instructions from the trial court as to the law, then we have, indeed, placed in jeopardy every citizen's right to a fair and impartial trial by jury, because there would be, awaiting in the darkened wings, that one or more appellate judge or judges, who for reasons known but to themselves, would disagree with the jury verdict, vacate that jury verdict, and thereby render totally ineffective this vital instrumentality of our criminal justice system.

While the right of trial by jury is, without question, primarily for the benefit of an accused, nonetheless, every citizen has a vital interest in the protection of that constitutional right free from undue interference from those members of the judiciary who first reach a conclusion, then attempt to justify that conclusion through serpentine-like rationale.

On June 15, A.D. 1215, in the seventeenth year of the reign of King John, there was adopted at Runnymede, what was known as the Great Charter of King John, commonly referred to as the Magna Charta. The 39th provision of the Magna Charta was "No free man shall be taken or imprisoned, or deseized, or outlawed, or banished, or in any ways destroyed, nor will be passed upon him, nor will we send upon him, *unless by the lawful judgment of his peers, or by the law of the land."* (Emphasis Added)

On July 4th, 1776, in the General Congress, Assembled, there is published a revered and hallowed document entitled The Declaration of Independence. Within this unanimous declaration of the thirteen United States of America then existing, we find these words: "That to secure these rights, governments are instituted among men, *deriving their just powers from the consent of the governed,* . . . . organizing its powers in such form AS TO THEM SHALL SEEM MOST LIKELY TO EFFECT THEIR SAFETY AND HAPPINESS." (Emphasis Added) Quoting further, "The history of the present King of Great Britain is the history of repeated injuries and usurpations, all having indirect object the establishment of an absolute tyranny over the states. To prove this, let facts be submitted to a candid word. He has refused to dissent the laws, the most wholesome and necessary for the public good. For depriving us in many cases of the benefits of trial by jury: . . . . . ."

So important was the right of trial by jury to the founders of this country, that that unimpaired right was imbodied in the Sixth Amendment to the Federal Constitution.

It is not within me to sit silently in my office and see such a valuable constitutional guaranty eroded away by the preconceived personal opinion of any one member of the judiciary.

While I would defend with all my vitality the right of my colleague to dissent, I must respectfully except to his re-trying the case before a one-man jury. While any criminal trial is subject to being factually questioned in one or more respects, a careful, un-emotional reading of the record and the authorities leads one to the conclusion that Judge Bussey is eminently correct in his opinion, and I therefore concur with Judge Bussey in all respects.